```
              UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF TEXAS (HOUSTON)

UNITED STATES OF AMERICA,      .
                               .  Case No. 4:24-cr-00253-3
               Plaintiff,      .
                               .
      v.                       .
                               .  515 Rusk Street
KE SHAUN JOHNSON,              .  Houston, TX 77002
                               .
               Defendant.      .  Friday, May 17, 2024
. . . . . . . . . . . . . . .  .  10:11 a.m.


              TRANSCRIPT OF DETENTION HEARING
          BEFORE THE HONORABLE CHRISTINA A. BRYAN
              UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the State:          DOJ-USAO
                        By:  LISA M. COLLINS, ESQ.
                        1000 Louisiana Street, Suite 2300
                        Houston, TX 77584
                        (713) 567-9000


For the Defendant:      WINIFRED AKINS PASTORINI, ESQ.
                        440 Louisiana, Suite 200
                        Houston, TX 77002
                        (713) 236-7300




Audio Operator:         Court Personnel



Transcription Company:  Access Transcripts, LLC
                        10110 Youngwood Lane
                        Fishers, IN 46048
                        (855) 873-2223
                        www.accesstranscripts.com

    Proceedings recorded by electronic sound recording,
transcript produced by transcription service.
```

I N D E X
5/15/24

**WITNESSES FOR THE GOVERNMENT**

JOSEPH OPPEDISANO                                                  PAGE

    Direct Examination by Ms. Collins                           14

    Cross-Examination by Mr. Gallagher                          38

    Cross-Examination by Ms. Pastorini                          45

    Cross-Examination by Mr. Thomas                             58

    Cross-Examination by Ms. Shields                            64

```
 1          (Proceedings commence at 10:11 a.m.)

 2              THE COURT:  Do we have all counsel present for the

 3   next detention hearing?

 4              THE CLERK:  Yes, Your Honor.

 5              THE COURT:  Are we missing Ms. Prater or --

 6              THE CLERK:  Mr. Gallagher is standing in.

 7              THE COURT:  Mr. Gallagher, you're standing in for

 8   Ms. Prater?

 9              MR. GALLAGHER:  Oh, I'm sorry.  Yes, Your Honor.

10              THE COURT:  Okay.  All right.  Do we have room at the

11   table for all of the defendants?

12          (Counsel confer)

13              THE COURT:  And are all defendants going forward with

14   their detention hearings?

15              MR. GALLAGHER:  Yes for Mr. Kelley.

16              MS. SHIELDS:  Yes for Mr. Tucker.

17              MR. THOMAS:  Yes for Mr. Jackson.

18              MS. PASTORINI:  And yes for Mr. Johnson.

19              THE COURT:  Okay.  Actually, let me have everybody up

20   front because they all need to be arraigned.

21              MR. THOMAS:  Okay.

22              THE COURT:  So let's do -- can we have Mr. Kelley --

23              UNIDENTIFIED:  Kelley.

24              THE COURT:  -- here.

25              UNIDENTIFIED:  Kelley.
```

```
 1                THE COURT:  Mr. Johnson next.

 2                UNIDENTIFIED:  Johnson.

 3                THE COURT:  Mr. Jackson after that, and then

 4    Mr. Tucker.

 5                UNIDENTIFIED:  Johnson, and this is Kelley, yes.

 6                UNIDENTIFIED:  Your Honor, you don't have anything

 7    else until two o'clock.

 8                THE COURT:  After this detention hearing, we do not

 9    have anything until two o'clock.  There was a request to start

10    the new arrest docket early so that people who were here --

11    there's a very thin staff at Pretrial Services, and so there

12    was a request to start early.  I don't know if the marshals

13    have --

14                MS. COLLINS:  We haven't confirmed it yet.

15                THE COURT:  Okay.  So just be --

16                MR. GALLAGHER:  I'll be around.

17                THE COURT:  Yeah, be ready to start early if that

18    happens.

19                Okay.  First of all, I've got Mr. Kenneth Kelley,

20    Mr. Ke Shaun Johnson, Mr. Lorenzo Jackson, and Mr. Nyreon

21    Tucker, correct?

22                DEFENDANT JACKSON:  Yes.

23                DEFENDANT JOHNSON:  Yes, ma'am.

24                THE COURT:  Okay.  Each of you has a copy of the

25    indictment, correct?
```

1               DEFENDANT JOHNSON:  Yes, ma'am.

2               THE COURT:  And each of you has had the opportunity

3    to talk with your attorney about the charges that have been

4    brought against you in the indictment, correct?

5               DEFENDANT KELLEY:  Yes, ma'am.

6               DEFENDANT JOHNSON:  Yes, ma'am.

7               THE COURT:  And have you had the opportunity to ask

8    any questions about the charges against each of you in the

9    indictment?

10              DEFENDANT KELLEY:  Yes, ma'am.

11              THE COURT:  I need everybody to answer out loud.

12              DEFENDANT JOHNSON:  Yes, ma'am.

13              DEFENDANT TUCKER:  Yes, ma'am.

14              THE COURT:  All right.  Counsel -- all counsel, do

15   you waive a formal reading of the indictment?

16              MR. GALLAGHER:  Yes for Mr. Kelley.

17              MS. PASTORINI:  Yes for Mr. Johnson.

18              MR. THOMAS:  Yes for Mr. Jackson.

19              MS. SHIELDS:  Yes for Mr. Tucker.

20              THE COURT:  All right.  And I thoroughly reviewed all

21   of the charges with each defendant at their initial appearance.

22              Mr. Kelley is charged in Counts 3, 4, 5, 6, 9, 10,

23   11, and 12.  Those are all counts of either interference with

24   commerce by robbery in violation of 18 U.S. Code

25   Section 1951(a) and Section 2, or a charge of using and

1  carrying a firearm during and in relation to a crime of

2  violence.

3           Mr. Johnson is charged in Counts 1, 2, 3, 4, 5, and

4  6.  Again those are all one of the two charges, either

5  interference with commerce by robbery, or using, carrying a

6  firearm during and in relation to a crime of violence.

7           Mr. Jackson, you are charged in Counts 9, 10, 11, and

8  12.  Again, those are all counts of the same -- one of two of

9  the same charges, interference with commerce by robbery or

10 using and carrying a firearm during and in relation to a crime

11 of violence.

12          Mr. Tucker, you're charged in Counts 7 and 8, which

13 is one count of interference with commerce by robbery, one

14 count of using and carrying a firearm during and in relation to

15 a crime of violence.

16          The interference with commerce by robbery charges

17 carry a maximum sentence per count of up to 20 years in prison,

18 a fine of up to $250,000, three years on supervised release,

19 and there's always a $100 mandatory special assessment.  All of

20 the charges of interference with commerce by robbery carry a

21 minimum sentence of five years in prison up to life in prison,

22 a fine of up to $250,000, up to three years on supervised

23 release, and again the $100 mandatory special assessment.

24          Does everyone understand what you are charged with

25 and what the minimum and maximum statutory penalties are if you

```
 1   are convicted?

 2             DEFENDANT JOHNSON:  Yes, ma'am.

 3             DEFENDANT JACKSON:  Yes, ma'am.

 4             DEFENDANT KELLEY:  Yes, ma'am.

 5             THE COURT:  I didn't hear you, Mr. Tucker.

 6             DEFENDANT TUCKER:  Yes, ma'am.

 7             THE COURT:  All right.  Are you ready to enter your

 8   formal plea to the charges in the indictment, Mr. Kelley?  And

 9   for you, that would be charges Counts 3, 4, 5, 6, 9, 10, 11,

10   and 12.

11             DEFENDANT KELLEY:  I'm not guilty.  Yes.

12             THE COURT:  All right.  We're entering a not guilty

13   plea on your behalf.

14             Mr. Johnson, are you ready to enter your formal plea

15   to the charges in Counts 1, 2, 3, 4, 5, and 6?

16             DEFENDANT JOHNSON:  Yes, ma'am.

17             THE COURT:  And what is your plea, sir?

18             DEFENDANT JOHNSON:  Not guilty.

19             THE COURT:  We're entering a not guilty plea on your

20   behalf.

21             Mr. Jackson, are you ready to enter your plea with

22   respect to Counts 9, 10, 11, and 12?

23             DEFENDANT JACKSON:  Yes.

24             THE COURT:  And how do you plead, sir?

25             DEFENDANT JACKSON:  Not guilty.
```

```
 1              THE COURT:  We're going to enter a not guilty plea on

 2   your behalf.

 3              Mr. Tucker, are you ready to plead to the counts

 4   in -- to the charges in Counts 7 and 8?

 5              DEFENDANT TUCKER:  Yes, ma'am.

 6              THE COURT:  And how do you plead, sir?

 7              DEFENDANT TUCKER:  Not guilty.

 8              THE COURT:  All right.  We're going to enter a not

 9   guilty plea on your behalf also.

10              The case is assigned to Judge Bennett.  You are set

11   for trial on July 22nd of 2024 at 9 a.m.  Your motions are due

12   by June 3rd, responses by June 13th.  Your proposed voir dire

13   and jury charges are due by July 11th.  And your pretrial

14   conference is set for July 18th at 2:30 p.m.  Is anyone waiving

15   speedy trial at this point?

16              MR. GALLAGHER:  Not for Mr. Kelley.

17              MS. PASTORINI:  Not at this time for Mr. Johnson.

18              MR. THOMAS:  No, Your Honor, for Mr. Jackson.

19              MS. SHIELDS:  No, not at this time for Mr. Tucker.

20              THE COURT:  Okay.  And, Ms. Collins, how many days do

21   you estimate for trial?

22              MS. COLLINS:  Five to seven, Your Honor.

23              THE COURT:  Okay.  All right.  Everyone can have a

24   seat at counsel table.  We'll --

25              MR. GALLAGHER:  Your Honor, is it okay -- the
```

```
 1   Government says it's fine if we -- Mr. Kelley and I can sit
 2   here and the other six folks can sit there so we can fit.
 3            THE COURT:  Okay.
 4            MR. GALLAGHER:  Okay.  Thank you.
 5            THE COURT:  That's fine.
 6            MR. GALLAGHER:  Is that okay?  Okay.  Mr. Kelley, sit
 7   here.
 8            THE COURT:  Okay.  Deputy?
 9            THE DEPUTY:  Ma'am.
10            THE COURT:  Mr. Espinoza has not had his high blood
11   pressure medication in three days.
12            THE DEPUTY:  Okay.
13            THE COURT:  He needs to get it.
14            THE DEPUTY:  I'll make sure that transport is ready
15   for him to pretty much take it as needed.
16            THE COURT:  Okay.  Can he go back early to --
17            THE DEPUTY:  Absolutely.  Yes.
18            THE COURT:  Okay.  So you're going to -- when you get
19   there, hopefully they can give you your medication, but you're
20   also going to get released from there.
21            MR. ESPINOZA:  Yes, Your Honor.  I'm very sorry, yes.
22            THE COURT:  Don't -- remember, don't say anything
23   because you have the right to remain silent, okay?
24            MS. COLLINS:  May I just ask one question?  Do you
25   have your blood pressure medicine or does your wife?
```

 1          MR. ESPINOZA:  No, the people in the --

 2          MS. COLLINS:  Got it.  That's all I needed to know.

 3  Thank you.

 4          THE COURT:  All right.  I think I'll ask, Counsel,

 5  how you prefer to do it?  Would it -- I mean, obviously there's

 6  going to be some information that applies to every defendant.

 7  There may be information that applies to a particular

 8  defendant.  It might be more clear to -- after you give me the

 9  information or you elicit the testimony regarding a particular

10  defendant, we might want to allow for cross-examination with

11  respect to that information at that time.  Or do you think it's

12  going to be more clear to just do -- put on all your evidence

13  and then allow each individual counsel --

14          MS. COLLINS:  Well --

15          THE COURT:  -- an opportunity for cross?

16          MS. COLLINS:  Your Honor, should we get to my

17  witness, I think it would probably be best because there's just

18  so much interplay between the cases.

19          THE COURT:  Okay.

20          MS. COLLINS:  That having been said, pursuant to

21  3142(e)(3), I will reserve comment pending the burden of

22  production by defense counsel on presumption.

23          THE COURT:  So are you telling me you're not going to

24  present any evidence?

25          MS. COLLINS:  Your Honor, as this is a presumption

```
1   case on -- as it contains multiple 924(c) charges, I do have a

2   witness ready should that burden be overcome by defense

3   counsel, but --

4              THE COURT:  Well, part of what defense counsel to

5   do -- can do to overcome the burden is cross-examine the

6   witness who is presented.

7              MS. COLLINS:  I understand that, Your Honor.

8   Nevertheless, I believe that it is their burden of production

9   and persuasion.

10             THE COURT:  All right.  So -- all right.

11             Mr. Gallagher?

12             MR. GALLAGHER:  As to Mr. -- well, I think just

13  legally the Court understands the burden.

14             THE COURT:  It --

15             MR. GALLAGHER:  To overcome the burden is quite -- is

16  a --

17             THE COURT:  It's a low burden.

18             MR. GALLAGHER:  Essentially.  And obviously the Court

19  can still consider that while making its determination as to

20  the decision.

21             THE COURT:  Correct.

22             MR. GALLAGHER:  But to overcome the burden takes just

23  almost nothing legally.

24             THE COURT:  Well, I don't know if I would say almost

25  nothing.  There has to be some evidence presented to overcome
```

1  the danger to the community and the risk of flight.

2          MR. GALLAGHER:  And so -- I'm sorry.

3          THE COURT:  And that evidence can be in the form of

4  testimony from a witness called by the Government, if -- you

5  know, if you can elicit testimony that would meet the burden.

6          MR. GALLAGHER:  But to overcome the presumption

7  regarding risk of flight, Mr. Kelley's connections to the

8  community are clear from the pretrial report.  He's lived his

9  whole life here.  His family members are here.  There's no

10  evidence of him having connections anywhere else or any means

11  to go anywhere else.  So as regarding risk of flight, I don't

12  think there's any question about that burden.  Regarding danger

13  to the community --

14          THE COURT:  Can -- before you continue, I'm just

15  going to take judicial notice of all the information contained

16  in all of the Pretrial Services reports.  And that includes the

17  information you've just given me about Mr. Kelley's contacts

18  with the community.  Go ahead, Mr. Gallagher.

19          MR. GALLAGHER:  And then as far as danger to the

20  community, I don't know that Mr. Kelley has never been

21  convicted of a prior offense.  He has been -- since the time of

22  this, he's been in custody, so there's been no failures to

23  appear, no violations of bond conditions on this or in any

24  other matters.  He is a young person who, as we said, has a --

25  well, I will proffer one thing that I have -- I'm not clear why

1    Pretrial wasn't able to make contact with his mother.  I have

2    spoken with his mother.  He has a place to stay.  She will

3    serve as a third-party custodian.

4           So that willingness to do so I think also overcomes

5    the burden, as well as the conditions that this Court can set

6    involving close confinement, ankle monitor, home confinement,

7    which has never been applied to Mr. Kelley before.  And so that

8    also shows that the Court has means at its disposable -- at its

9    disposal to overcome the danger to the community, Your Honor.

10          THE COURT:  Thank you, Mr. Gallagher.  We can

11   continue in this fashion or we can --

12          MS. COLLINS:  Your Honor, and I'm not trying to be

13   difficult.  I assure you that is not my goal here at all.  I

14   just think, obviously this is a presumption case, and so

15   allowing for that.

16          THE COURT:  I understand it's a presumption.  I

17   understand they all have the burden, but it is a low burden.

18   The case law is clear it's a low burden.  And I think, you

19   know, taking judicial notice of the information in the reports,

20   you know, there is evidence in the record certainly to address

21   as to each defendant their ties to the community, and based, at

22   least in part, on the fact that each of these defendants is

23   about 19 years old, there may  -- although there are many

24   arrest charges with respect to each defendant, we don't have

25   convictions yet.  So, you know, it is possible that that

Oppedisano - Direct/Collins                    14

 1  information can overcome the presumption.

 2          MS. COLLINS:  With that in mind, Your Honor, then I

 3  will call Joe Oppedisano to the stand.

 4          THE COURT:  All right.  Thank you.

 5          THE CLERK:  Raise your right hand.

 6      JOSEPH OPPEDISANO, GOVERNMENT'S WITNESS, SWORN

 7          THE CLERK:  You may proceed.  Ms. Collins?

 8          MS. COLLINS:  Yes, Your Honor.

 9                   DIRECT EXAMINATION

10  BY MS. COLLINS:

11  Q    Could you please state your name for the record.

12  A    Joseph Thomas Oppedisano.

13  Q    And if you wouldn't mind spelling the last name for us.

14  A    O-P-P-E-D-I-S-A-N-O

15  Q    Where do you currently work?

16  A    I work for the FBI as a special agent.

17  Q    And do you have a specific assignment?

18  A    Yes.  I'm on the violent crimes task force in Houston,

19  Texas.

20  Q    All right.  Do you also work at something commonly known

21  as the TAG?

22  A    Yes.

23  Q    And what is that?

24  A    It's the -- it's basically the -- it's a Texas Against

25  Gangs unit, if you want to call it that.

Oppedisano - Direct/Collins                    15

1    Q    All right.  And what does that mean?  What do you -- what

2    are you able to do at that location?

3    A    We work with state and local partners who are on task

4    force with the FBI to combat violence within the Houston AR.

5    Q    All right.  Based on that, do you commonly work with

6    members of the Houston Police Department?

7    A    Yes.

8    Q    All right.  In the case that we're here for today, did you

9    become alerted to a series of aggravated robberies occurring in

10   the Houston area?

11   A    Yes.

12   Q    Can you tell us how you first came into contact with this

13   case, how you first became aware of it?

14   A    One of my partners who's a Houston PD task force officer

15   on my squad notified me that there was a bunch of Uber/Lyft

16   robberies that were occurring almost every other day.  And they

17   were trying to combat against stopping that as quick as they

18   possibly could.

19   Q    Okay.  You said a series of Uber or Lyft robberies.  Can

20   you tell us the basic MO or what was occurring in each of these

21   robberies?

22   A    Yes.  So when it was brought to my attention, it was

23   between two to three unknown Black males would take a rideshare

24   or have a rideshare sent to a location where the rideshare

25   driver would then pick them up.  As soon as they depart, within

Oppedisano - Direct/Collins                    16

1  a matter of minutes or moments, firearms would be pulled out

2  and then they would be robbed at gunpoint for either cash on

3  them, cell phones, debit cards.  If they can get debit cards,

4  then they would then take them to ATMs where they could take

5  out money and cash off of that or have them transferred to Cash

6  App accounts.  In some instances, there was -- they were --

7  they were threatening the victims.  They would threaten the

8  victims.  In some instances, there -- they would use force

9  against the victims.  There was sexual assault against one of

10 the victims, and basically held against their will until they

11 released them from whatever -- whatever timeframe they wanted

12 to.

13 Q    All right.  And so to be clear, as these suspects were

14 going around using the debit cards and things like that, where

15 were the victims during that period of time?

16 A    The victims were inside the vehicle with the subjects.

17 Q    All right.  In total, how many of these types of robberies

18 did you find connected to this group that seemed to be

19 committing these similar robberies?

20 A    Approximately 19 incidences ranging between the beginning

21 of April of 2023 until the end to middle of June of 2023.

22 Q    All right.  Now, obviously not every single one of these

23 robberies is in the indictment.  If we could just go one by one

24 for the individuals that we have present today, could you give

25 the Court an idea, for instance, with regard to Lorenzo

1  Jackson, of those 19, how many does law enforcement currently

2  have him connected to?

3  A    Approximately five.

4  Q    And with regard to Nyreon Tucker, about how many of these

5  do we have him connected to?

6  A    Approximately three.

7  Q    And with regard to Kenneth Kelley, how many of these do we

8  have him connected to?

9  A    Approximately eight.

10 Q    And with regard to the last, Ke Shaun Johnson, how many is

11 he connected to of these robberies?

12 A    Approximately five.

13 Q    All right.  I want to just kind of go through those cases

14 that were chosen for the indictment.  Can you give us an

15 idea -- kind of go one by one through each of the counts --

16 A    Sure, yeah.

17 Q    -- and give us just an idea of the underlying facts of

18 each of those offenses.

19 A    Sure, just bear with me.  There's a lot of cross between

20 the Uber and Lyft cases.  I want to make sure I get the facts

21 accurate.  So on May 24, 2023, a Uber female rideshare driver

22 picked up three unknown Black males at a location within

23 Houston.  When she picked them up, as soon as they proceed to

24 drive off, a pistol was taken out and presented towards the

25 victim and demanded money, currency, debit cards, things of

Oppedisano - Direct/Collins                    18

1    that nature.  They also utilized a transfer to a Cash App,

2    which was later identified, where money was then sent to in

3    order to help basically give the currency over to them in the

4    electronic formation.

5        After a little bit of -- a little bit of time of trying to

6    get the -- any debit cards or anything of that nature, they

7    ended up releasing the victim and they took off on foot.  And

8    then that -- that was that incident.  That incident that we

9    have so far, Ke Shaun Johnson was present during that based off

10   of the photo array for -- that was shown to the victim in that

11   instance.

12       The May 29th incident was a Lyft female driver who picked

13   up three unknown Black males, same MO as I described.  They all

14   got in the vehicle and then, shortly after the ride, they left,

15   a pistol was then presented to the victim at that time

16   demanding cash, cell phones, debit cards, things of that

17   nature, where the cell phone was taken in this instance.  Some

18   cash and belongings were taken as well, personal belongings

19   like AirPods and stuff like that.  They -- once they could not

20   get any other -- any more money or belongings, they departed on

21   foot and left that location as well and left her stranded

22   without a phone because they had taken the phone at that -- at

23   that time.

24       Kenneth Kelley was present based off of the name off of

25   the rideshare that was requested, which was KK, who we learned

1    through the investigation is his name that he goes by, that is

2    like an alias.  Their cell phone presence -- his cell phone

3    presence for Kenneth Kelley was potentially there at the -- at

4    the sites.  The photo array was -- for Kenneth Kelley was also

5    shown and he was picked out of -- out of that photo array.  And

6    then there was a video of himself and Ke Shaun at a pawn shop

7    pawning in the -- some of the belongings that were taken from

8    that one instance.

9    Q    And let me pause you right there.  You stated that in that

10   encounter, AirPods were taken.  Is that correct?

11   A    Yes.

12   Q    And was that one of the items that was then pawned at the

13   local pawn store?

14   A    Yes.

15   Q    All right.  And you mentioned -- we've mentioned Ke Shaun

16   a couple of times now.  In the course of this investigation,

17   did he become kind of known, if you will, by the nickname of

18   Blue Jacket -- Blue Jacket Guy?

19   A    Yes.

20   Q    And why is that?

21   A    Because at the -- one of the ATMs, he was wearing the blue

22   jacket sweatshirt hoodie that he used to cover his -- disguise

23   himself as he went to the ATM.

24   Q    All right.  Did he wear this on not just one but several

25   different robberies that were -- that occurred during these

Oppedisano - Direct/Collins                          20

1    19 -- this 19-robbery spree, if you will?

2    A    Yes.

3    Q    And specifically you mentioned that, most commonly, when

4    these robberies took place, they were holding the victim in the

5    car, going around to different ATMs to use the debit cameras.

6    Were you all able to actually go back and obtain the video

7    surveillance from many of those ATMs in this case?

8    A    Yes.  We were on many of them, not all of them, just based

9    off of the -- due to the nature of us finding out which ATM it

10   was after the investigation.  There's a time lapse between the

11   time we find out and what time when it gets written over.

12   Q    Sure.  In multiple cases, with regard to Ke Shaun, was he

13   wearing that blue hoodie literally in a camera where you could

14   see his face?

15   A    Yes.

16   Q    And was that one of the easy ways to identify him in the

17   five different aggravated robberies we have him connected to?

18   A    Yes.

19   Q    All right.  I believe that you were discussing 529.  Let

20   me also just back up while we're talking.  After -- at the end

21   of this investigation, after you were able to identify the

22   individuals you believed were involved, did you and others

23   subpoena the phone records for each of these four defendants?

24   A    Yes.

25   Q    Were you then able to go back -- let me actually clarify

Oppedisano - Direct/Collins                    21

1    that.  For three of these four, Nyreon Tucker you did not

2    receive phone records for.  Is that correct?

3    A    Yes, we did not.

4    Q    All right.  For the three that you did, did you all go

5    back and do tower mapping to see if you could place these

6    individuals at the scenes of the varying offenses?

7    A    Yes.

8    Q    A moment ago, when you said that the phones, I believe it

9    was Kenneth Kelley, placed him at the scene, is that what you

10   were referencing?

11   A    Yes.

12   Q    All right.  And you mentioned that it was Kenneth Kelley

13   and Ke Shaun that were seen pawning those AirPods.  Is that

14   correct?

15   A    Yes.

16   Q    All right.  And I know I interrupted you.  Were you done

17   with the March 29th incident?

18   A    I was just finishing up on how Ke Shaun also had his cell

19   phone presence picked out of a photo array that was given to

20   the victim, and he was also obviously on the photo -- the pawn

21   shop video as -- like I said moments ago.

22   Q    All right.  Moving on to the next incident, can you take

23   us through that?

24   A    Yes.  This was June 3rd, 2023.  It was a female Uber

25   rideshare driver picked up two unknown Black males.  The

Oppedisano - Direct/Collins                    22

 1  name -- the rideshare name that came across was KK again, same
 2  as the previous one.  The two males get out up the backseat,
 3  and they obviously pulled out another firearm and did the same
 4  typical MO where they would demand money, cash, debit cards, of
 5  that nature.  The difference was, on this one, there was a
 6  sexual assault that occurred with the victim.  During the
 7  course of the robbery, the subject moved the female into the
 8  front passenger seat while one of the subjects drove and the
 9  other one still stayed in the back.  Come to find out that it
10  was Kenneth Kelley in the backseat.  Ke Shaun Johnson was
11  driving.
12       The female driver is -- she's gay and she was asked if she
13  liked men.  And she had proceeded to tell them that she is gay,
14  she does not like men.  And in that time, she turned around and
15  Kenneth Kelley turned and told her, well, that's something to
16  the effect of, I don't care, let's -- let me try and change
17  that for you, and at gunpoint proceeded to force her to perform
18  oral sex on him while Ke Shaun drove the vehicle to various
19  ATMs to try and take out more cash.
20       She did not know where she was, obviously, because she was
21  performing oral sex, so she couldn't get her bearings on where
22  she was until she got up.  And even then, she didn't know where
23  she was.  To try and get out of the situation, she made some
24  excuses that, you know, she can't have sex or she can't do
25  this, to then turn around and try and push that off even

Oppedisano - Direct/Collins                    23

1  further so they would stop.  And then, eventually, they took

2  the cash and went to some ATMs and then left her and fled --

3  fled on foot again.

4      Present was going to be Kelley -- like I said, Kenneth

5  Kelley because the rideshare name again was KK, cell phone

6  presence was near some of the -- some of the sites, and then

7  obviously the photo array was given to the victim, who then

8  picked out KK, Kenneth Kelley.  Ke Shaun had a photo array as

9  well, the ATM video, and during his interview, he places

10 himself at the scene of -- during the -- the -- during the

11 interview with law enforcement and explained how he did not

12 sexually assault her, and then basically alludes to Kenneth

13 Kelley being present for that.

14 Q    All right.  And just to be super clear, at the time that

15 this rideshare driver was forced to perform oral sex, was that

16 at gunpoint?

17 A    Yes.

18 Q    Furthermore, did she make it quite clear in multiple

19 interviews that she did not want to perform oral sex on either

20 of these men?

21 A    Yes.

22 Q    In the interview where Ke Shaun Johnson places himself in

23 the vehicle, does he admit that there was some form of sexual

24 intercourse occurring between Kenneth Kelley, who he names and

25 IDs, and this rideshare driver?

1    A    Yes.

2    Q    And again, also to be clear, is this sexual assault taking

3    place literally while they are still driving around stealing

4    her money as well?

5    A    Yes.

6    Q    All right.  Continuing on to the next robbery that's

7    included in the indictment.

8    A    Yes.  That's June 7th, 2023.  And that is a Uber rideshare

9    male who picked up three unknown Black males with the rideshare

10   name Nyreon.  Again, same MO.  They get in the vehicle, they

11   start to depart the location that they were picked up at, and a

12   pistol was then presented to them, to the -- to the -- to

13   the -- the victim, where they demanded cash.  Told him that,

14   you know, if you move, we'll kill you, just comply with us,

15   things along that nature to intimidate the victim.

16        The -- they rode around, trying to get some more cash and

17   whatever else they can get while holding him at gunpoint.  The

18   victim at that point turned around and did not want to -- he

19   wanted to try to defend himself, so he grabbed the weapon and

20   pushed it -- raised it -- he grabbed a hold of the front of the

21   weapon of the barrel and raised it to the top of the roof of

22   the car.  In the midst of the struggle, he stepped on the

23   accelerator and crashed into a vehicle.  At that time, that's

24   when the subjects got out of the vehicle and departed the

25   location on foot.

Oppedisano - Direct/Collins                    25

1   Q    All right.  How were we able to link the individuals that

2   are charged in the indictment to that robbery?

3   A    Nyreon Tucker was -- is previously on bond and had an

4   ankle monitor on that was GPS located.  So going back and

5   getting the GPS data was easier to -- to show where he was

6   during that time.  Photo array, he -- Nyreon Tucker was picked

7   out of during -- when the victim was shown that.  And the

8   rideshare name was Nyreon, which then, from the grand jury

9   subpoena, gave the information that he provided to the

10  rideshare company when he first started the Uber account or

11  call -- whatever you want to call it.

12  Q    All right.  And I want to kind of pause you there.  You

13  mentioned that Nyreon Tucker had an ankle monitor on.  Are you

14  familiar with what type of case he was charged with at the time

15  that he committed this robbery?

16  A    Yes.

17  Q    Can you tell us what it was?

18  A    I don't have the facts of the case.  I just know that it

19  was aggravated robbery to, I believe, a Walgreens and that he

20  was placed on an ankle monitor for that incident.  And that --

21  that's all I know for that.

22  Q    Fair enough.  And with regard to that count, you mentioned

23  Nyreon Tucker's involvement in it.  Can you go through and

24  discuss Lorenzo Jackson's involvement in that?  And I'm flying

25  without any computer or any of my notes, so feel free to

Oppedisano - Direct/Collins                              26

1  correct me --

2  A    To my knowledge --

3  Q    -- at any time.

4  A    To my knowledge, Lorenzo Jackson was not on that one.

5  He's not part of that count.

6  Q    Okay.  Can you move us on to the next one?

7  A    Sure, June 13th, 2023.

8  Q    Actually, let me -- I did misstate.  He was involved in

9  that.  Can you tell us about Brian Dorsey's involvement?

10  A    Yes.

11  Q    Actually, you know what, let's just save that for when

12  he's in front of us.  All right.  Moving along to the next

13  robbery.

14  A    June 13, 2023, it was another -- it was a Lyft rideshare

15  driver.  A male picked up three unknown Black males.  Same MO

16  again.  Again, the vehicle, pistol to the back of his head, or

17  to the side of his head, I can't recall.  And they moved the --

18  they moved this victim to a different part of the vehicle, and

19  then one of the unknown subjects drove that vehicle.

20       They drove around and, you know, same MO, asked for a

21  wallet, cell phones, try and transfer, debit cards, things of

22  that nature, and then turned around and -- during the

23  testimony, we didn't know this until we interviewed the victim,

24  but according to him, they drove to two different locations and

25  robbed two other individuals or -- or companies.

1     Not warehouses, like a lawn service company, and I can't

2  recall the other one, and then they left those scenes with the

3  victim still present, being held at gunpoint, and then drove to

4  the next location, where they ended up going to some ATMs and

5  they took out approximately $3,500 from -- from the combined

6  ATMs.  And then they drove to the neighborhood where they

7  wanted to get dropped off at, and they basically told him that

8  if you notify police, they would kill him.  And then they left

9  and departed the location and left him by himself.

10     Present for a photo array and cell phone presence was

11  Kenneth Kelley, and then Lorenzo Jackson for cell phone

12  presence and photo array.

13  Q    All right.  Was there sort of an aggravated robbery that

14  occurred that sort of led to what I would call, I guess, the

15  break in this case?

16  A    Yes.

17  Q    And can you tell us about that?

18  A    That would be when Kenneth Kelley was arrested in the last

19  incident that I'm about to talk about, vehicle -- stolen

20  vehicle the following day after the incident.

21  Q    All right.  And I'm jumping ahead.  Can you talk to us

22  about the original robbery that occurred and then the eventual

23  location of Kenneth Kelley in that vehicle?

24  A    Yes.  That was on June 20th, 2023.  It was another

25  rideshare.  Uber female driver picked up three unknown Black

1    males.  Same MO, took out a pistol, wanted -- demanded cash,

2    money.  This Uber driver did not really have too much to give

3    or offer.  They drove her around for a while, trying to get her

4    to give money or have people transfer money to her.

5    Eventually, they ended up at a gas station where she was still

6    driving, and Kenneth Kelley is seen on video getting out of

7    that vehicle, going into the convenience store, going back and

8    forth.  I believe he was trying to access the ATM, but I can't

9    be certain on that.  But he's going in and out of the -- in and

10   out of the store, back and forth to the vehicle.

11       At some point in time during the -- them sitting there,

12   obviously there's two more unknown males in the vehicle that

13   are sitting there with the victim so she doesn't drive away or

14   leave.  She decides to just get up, get out of the vehicle, and

15   go into the convenience store and lock herself in the bathroom.

16   That's when you see Kenneth Kelley come out and get in the

17   driver's seat.  And then that's when you also see on video

18   camera Lorenzo Jackson get out of the back right seat with a

19   handgun in his hand and get in the front seat.

20       They depart the location.  And then if you fast forward to

21   the next day, Kenneth Kelley and another male who was

22   identified are up the block of the gas station or convenience

23   store with that vehicle.  Marked units were on the lookout for

24   a stolen vehicle.  They came across this during their just

25   routine investigation looking for that vehicle.

Oppedisano - Direct/Collins                    29

```
 1        They find it at the store and then they performed to try
 2   and take them into custody.  And during that time, the
 3   individuals looked out of the -- out of the car and they
 4   proceed to try and flee on foot.
 5   Q    And let me be very clear.  Was Kenneth Kelley one of the
 6   individuals who attempted to flee from law enforcement?
 7   A    Yes.
 8   Q    Was he caught there at the scene?
 9   A    Yes.
10   Q    When they -- after they had detained the individuals that
11   were in the stolen vehicle, were they able to do a search of
12   the vehicle?
13   A    Yes.
14   Q    Can you tell us what, if anything, they found inside the
15   vehicle?
16   A    They found the -- a handgun.
17   Q    What was that?  I'm sorry?
18   A    A handgun.
19   Q    And do you recall if that was a loaded handgun or not?
20   A    I do not recall off the top of my head.
21   Q    Okay.  Before we move on, once Kenneth Kelley was
22   arrested, was he found to have a phone on his person?
23   A    Yes.
24   Q    Were we able to get a warrant for that phone, and have you
25   had a chance to review the contents of that phone?
```

1    A    Yes.

2    Q    All right.  And I'm not going to put you on the spot.

3    There was a lot of data on the phone.  Is that fair?

4    A    Yes.

5    Q    Have you had a chance to review at least some parts of

6    that data?

7    A    Yes.

8    Q    All right.  With regard to that, were you able to find

9    where Kenneth Kelley was either messaging other individuals to

10   pick up Uber or to order Ubers or ordering them himself?

11   A    Yes, it was a female.  The name escapes me at the moment,

12   but he was asking her to order him rides and then alluded to

13   make sure that -- let me know what -- let me see a picture of

14   them before you order it so I can basically vet them to see if

15   they're somebody that's going to be easy to rob or not.  And he

16   used the word "stick," which from my training experience

17   working violent crime, is referencing a -- a weapon, a firearm.

18   Q    All right.  In addition, are there actually texts where he

19   is telling people he's ordered the Uber and for them to come

20   meet him?

21   A    Yes.

22   Q    Specifically, off the top of my head, were at least one of

23   those texts to Lorenzo Jackson here in the courtroom with us

24   today?

25   A    Yes.

1   Q    All right.  Eventually, were Ke Shaun, Lorenzo, and Nyreon

2   also arrested by law enforcement?

3   A    Yes.

4   Q    And I want to go just one by one through their arrests.

5   With regard to Ke Shaun Johnson, can you tell us the

6   particulars of his arrest by law enforcement, specifically FBI

7   and HPD?

8   A    So yes, we were doing -- that day we were trying to take

9   down multiple subjects for this incident, so I was not present

10  for his actual arrest.  I was not there.  From my -- but from

11  my understanding, when he was found by our TFO partners, he

12  was, I believe, with his father, and they were at a fishing

13  pier or trying to fish when he was apprehended by his -- with

14  him in the vehicle, or the vehicle they drove in.

15  Q    All right.  And if you recall, did he drive there with his

16  father or separately?

17  A    From my understanding, with his father.

18  Q    All right.  After Ke Shaun Johnson was arrested -- and I

19  guess to be fair to him, there wasn't any struggle.  He didn't

20  resist or anything like that?

21  A    No.

22  Q    All right.  After he was arrested, did they have a chance

23  to look inside of his vehicle?

24  A    Yes.

25  Q    And can you tell us what they found there?

Oppedisano - Direct/Collins                     32

1   A    A handgun that was on the floorboard.

2   Q    And if you recall, was it on the driver's side floorboard,

3   passenger floorboard?

4   A    I believe it was on the backseat passenger floorboard

5   behind the driver, if my memory serves me correctly.

6   Q    All right.  And that gun was found in the same vehicle

7   that he had driven there with his father for fishing?

8   A    Yes.

9   Q    All right.  With regard to Lorenzo Jackson, can you tell

10  us the particulars?  I believe you were actually at that

11  scene --

12  A    Yes.

13  Q    -- of that day in that arrest?

14  A    Yes.  So I was at that scene.  Originally we were going to

15  go there and do a -- what we typically do to arrest somebody in

16  the morning.  We -- when we got there, we noticed that there

17  was a lot of movement in and out of the house, family members

18  or people we just didn't know, so we wanted to sit there on

19  surveillance just so we can assess who's coming and going.  And

20  if he leaves, Lorenzo Jackson, then we can just traffic stop

21  him so it would just be a lot easier than going to the house.

22      Lorenzo was on the phone, and he was in and out of the

23  house at that point.  What we believed -- and we don't have it

24  because we never recovered it, but from what we could see, it

25  looked like he had a firearm in his pants or hooded sweatshirt

Oppedisano - Direct/Collins                                    33

1    area.  And he was on his phone when he got into a vehicle with

2    another male driver.  They drove actually past me, made a

3    right-hand turn off of his block and on to a subsequent block,

4    where then he was followed by another vehicle that was part of

5    our operation.  As soon as they made a quick left, they stopped

6    that vehicle, and there was only one male inside, the driver,

7    and Lorenzo Jackson was not present, so he had fled on foot.

8        We don't know which direction he went in at that time, so

9    we set up our perimeter and started calling in more units to

10   try and apprehend Lorenzo Jackson from fleeing.  When -- some

11   time had passed, we did not -- we could not locate him.  Myself

12   and a couple other FBI agents approached the house to try and

13   talk to some of the other people that were outside, which we

14   came in contact with his mother, his sister, and then there was

15   a bunch of relatives and friends that were hanging around.

16       We -- I disclosed some of the information of what's going

17   on with the incidences and how we need to get in touch with

18   Lorenzo.  We need to talk to him.  We have an arrest warrant

19   for him on the state side and we need to -- for him to come in

20   and -- and let -- let's have a talk or see what his side of the

21   story is to get some cooperation.  His mother assured me that

22   he was going to cooperate and --

23   Q    Let me kind of pause you right there because it's a lot of

24   information.

25   A    Sure.

Oppedisano - Direct/Collins                    34

1    Q    Backing up just a little bit, with the law enforcement

2    that was there at the scene for the arrest warrant, was anybody

3    able to see what happened from the time he left in the vehicle

4    until the time the vehicle was stopped?  In other words, did

5    anybody see him get out of the vehicle?

6    A    Nobody saw him get out of the vehicle because we wanted to

7    create a little bit of space until the marked units got up to

8    where we were in order to initiate the traffic stop on that

9    vehicle.  So we didn't want a foot pursuit or a car chase, so

10   our unit that was -- the lead unit that was following that

11   vehicle created some distance in order for the marked units to

12   show up.  And by the time the marked units got there, he --

13   the -- the -- he had already left -- jumped out of the vehicle.

14   Q    Nevertheless, did law enforcement still talk to the driver

15   of that vehicle?

16   A    Yeah.  And at first he did not want to cooperate.  He said

17   there was nobody in the vehicle, which obviously we were on

18   surveillance, so we watched him get inside the vehicle, but --

19   Q    Did he -- go ahead.

20   A    Then he eventually cooperated and said that, yeah, there

21   was a second person in the vehicle with me.

22   Q    Okay.  And did he tell law enforcement where that

23   vehicle -- that person went?

24   A    He just said he got out and ran.

25   Q    All right.  You mentioned that you were talking to the

1  defendant's mother or Lorenzo's mother there at the scene.  Is

2  that right?

3  A    Yes.

4  Q    All right.  When you all first made contact with Lorenzo

5  Jackson's mother, was there some conflict between her and local

6  law enforcement?

7  A    Yes.

8  Q    Can you tell us about that?

9  A    She was very agitated with Houston PD and didn't -- did

10  not want them really on the scene, which was my partner, who I

11  was working with for this case.  So to calm the tension, I -- I

12  asked him to just step back a little further off the perimeter

13  and just hang tight while I had some FBI agents up there with

14  me.

15  Q    Okay.  Well, to be very clear, did she state that she

16  would not cooperate as long as Houston Police Department was

17  there on the scene?

18  A    Yes.

19  Q    Once she was cooperative and speaking to you, did she

20  essentially agree to help you locate Nyreon?  Or, excuse me,

21  Lorenzo --

22  A    Lorenzo.

23  Q    -- Jackson.

24  A    Yes.  Yes, she did.

25  Q    And can you tell us how that came about?

1   A    We spoke for a while just about the case, about what he's

2   potentially involved in, and how, you know, she can -- he can

3   help himself out if we -- if we -- if he wants to talk to us,

4   but we need to take him into custody and that we're not just

5   going to drive away.  Eventually, I had said, listen, we have a

6   perimeter set, so I'm going to go on the -- we're going to go

7   to the -- towards the outermost part of the perimeter and I'm

8   going to wait for you.  If you can get in touch with him within

9   the next ten minutes, I will stand by for your phone call and

10  then we'll take him into custody that way.

11       And a lot easier than us trying to bring in a canine,

12  because that's what we were trying to do and -- was to get a

13  canine to show up on scene.  And then within a matter of

14  minutes of me leaving the scene and going to the perimeter, she

15  called me back and said that he's over -- over here behind a

16  tree bush area.  And she walked down the block and that's when

17  we took -- that's when he came out from where he was hiding

18  and -- and we took him into custody.

19  Q    All right.  Did you all have an opportunity to talk to him

20  afterwards?

21  A    Yes.

22  Q    During the course of that Mirandized interview, did he

23  admit that he had been evading law enforcement that day?

24  A    Yes.  And that only came up because his mother was very

25  nice to me, and we had a conversation about trying to, like,

Oppedisano - Direct/Collins                                    37

1   get him to cooperate, and he -- she -- she assured that he

2   would cooperate and talk and do things of that nature.  So I

3   thought, during the interview, once I Mirandized him, he would

4   want to talk and help himself out.  And at that point is when

5   he said, if I didn't want to -- something along the lines of if

6   I didn't -- if I wanted to cooperate, I wouldn't have ran.

7   Q    All right.  And I want to finally discuss the arrest of

8   Nyreon Tucker.  At the time of his arrest, was he still in fact

9   on an ankle monitor on bond?

10  A    Yes.

11  Q    Were you able to locate him at -- well, where did you

12  locate him?

13  A    I did not locate him.  It was the local law enforcement

14  that located him through the investigation.  They learned that

15  vehicle that he -- that he was driving -- that he drives, they

16  located that vehicle and they initiated a stop, and that's --

17  and he was taken into custody without incident.

18  Q    All right.  Once they had arrested him, were they able to

19  do a search of his vehicle?

20  A    Yes.

21  Q    And can you tell us what, if anything, was found inside?

22  A    A handgun.

23  Q    And was that a loaded gun?

24  A    I believe so.

25  Q    And again, I guess, just to be clear, the six incidents

1  that we've discussed today in more detail, are these the only

2  incidents that these four gentlemen are connected with?  Let me

3  rephrase that just --

4  A    Yeah.

5  Q    -- to be real simple.  You've mentioned that, for

6  instance, Lorenzo was connected to five of the nineteen

7  robberies.  The six that we just described are not all five of

8  those incidents.  Is that fair?

9  A    Correct.

10          MS. COLLINS:  Okay.  Pass the witness, Your Honor.

11          THE COURT:  Mr. Gallagher, if you have questions.

12          MR. GALLAGHER:  Thank you, Your Honor.

13                    CROSS-EXAMINATION

14  BY MR. GALLAGHER:

15  Q    So the first offense you discussed -- and I represent

16  Mr. Kelley.  So the first offense you discussed involving

17  Mr. Kelley was May 29th, correct?

18  A    Yes.

19  Q    All right.  Because you discussed one previously, but you

20  don't believe --

21  A    Yes.  Just bear with me, I just want to make sure I give

22  you the --

23  Q    I just want to make sure we're clear.  I'm not --

24  A    Yes.

25  Q    I'm not trying to rush you.

1   A    Yes.

2   Q    Great.  So on that, the -- your understanding is that the

3   victim had taken AirPods and a cell phone.  And was there

4   anything else?

5   A    The cell phone -- just it was $26 in cash in U.S.

6   currency.

7   Q    Was the -- has the cell phone that was taken ever been

8   recovered?

9   A    It has not, and it was valued at $1,000.

10  Q    Okay.  And so you said that the video -- the AirPods,

11  however, were recovered?

12  A    So there's -- there is a pawn shop video of them entering

13  the video -- the store and pawning some belongings.  The -- we

14  have the receipt for the AirPods, which has a serial number

15  that was given to us from the victim.

16  Q    Okay.  When was the -- when was the -- when did they visit

17  the pawn shop?

18  A    I believe it was approximately June 2nd -- June 2nd, 2023.

19  Q    And you say on that video is Mr. Kelley and Mr. Johnson,

20  or is it Jackson?  I'm sorry.

21  A    Yes.

22  Q    Okay.

23            THE COURT:  Johnson or Jackson?

24  BY MR. GALLAGHER:

25  Q    It's Johnson, right?

1    A    Yes.

2    Q    Okay.  Thank you.  And you discussed various -- I guess,

3    of course, several of the robberies, various ATM videos, right?

4    A    Yes.

5    Q    And I know you mentioned that you believe Mr. Ke Shaun

6    Johnson is in several of those, right, wearing a blue hoodie?

7    A    Yes.

8    Q    In any of the ATM videos, is Mr. Kelley visible?

9    A    No.

10   Q    And I guess on the final incident you discussed involving

11   Mr. Kelley --

12   A    The June 20th?

13   Q    Yes.  Sorry, let me -- now I need to keep up with you.

14   Yes, exactly.  That one, you believe there is a video that

15   during the course of the robbery that depicts Mr. Kelley.  Is

16   that right?

17   A    Yes.  She was still being held at gunpoint and was not

18   free to leave.  They were at a gas station at one of the pumps.

19   I don't remember which pump it was, but we have the video of

20   several angles of the vehicle pulling up and Kenneth Kelley

21   getting out and going into the store.  And he actually goes

22   back and forth to the vehicle several times.

23   Q    So other than that video you just described, is there any

24   video of Mr. Kelley during the course of any of these robbery

25   events you described?

1    A    You mean like actually inside the vehicle?  Is that what

2    you're referring to?

3    Q    I'm trying to be a little broader than that.  I'm

4    saying -- you know, I'm putting aside the -- I'm trying to

5    separate out the pawn shop.

6    A    Okay.

7    Q    So either in the video with the people going to the ATMs,

8    you mentioned like there was some incident where there were --

9    during the course of the robbery, I think this was on the one

10   prior to that June 20th, maybe June 7th.  No, I didn't write

11   down the date for this, but anyway there was one you mentioned

12   where during the -- while the victim was still in the car, you

13   believe the robbers actually committed other robberies, right?

14   A    Yes.  That was June --

15   Q    So I'm just asking while --

16   A    -- June 13th.

17   Q    Yes.  So which date was that?  Sorry, June 13th?

18   A    June 13th was that one.

19   Q    Okay.  So I'm trying to be broader.  So during the course

20   of any of these actually ongoing robbery events, other than

21   that one video at the gas station you just described, is there

22   any video that depicts Mr. Kelley?

23   A    To my knowledge, no.

24   Q    And you said -- and actually you mentioned several

25   firearms being found during the arrests of the various

Oppedisano - Cross/Gallagher                    42

1  defendants, right?

2  A    Yes.

3  Q    Does that say -- so in the -- the firearm in Mr. Kelley's

4  car, what type of firearm was that?  I should -- let me restate

5  that question to be clear.  It wasn't Mr. Kelley's car, right?

6  So I'm asking about the firearm that was found in the vehicle

7  at the time of Mr. Kelley's arrest, right?

8  A    The -- the June 20th stolen vehicle.  Is that what --

9  Q    Yes.

10  A    -- you're referring?

11  Q    Yes.

12  A    Okay.  And what's the question?  I'm sorry.

13  Q    So describe the -- the firearm that was found, can you

14  describe it?

15  A    I mean, it was a semiautomatic handgun.  I don't know

16  which make or model off the top of my head.  There were

17  several -- like I said, there were several firearms that

18  were -- we -- that were taken in throughout the course of the

19  investigation, so there's a lot of facts.

20  Q    Are you able to match that firearm as any of the ones that

21  was displayed in any of the robberies you described?

22  A    No.

23  Q    And so at the time Mr. Kelley was arrested --

24  A    Can -- can I say something real quick?  Sorry.

25  Q    Okay.

Oppedisano - Cross/Gallagher                    43

1   A    The reason I said no for being able to match it is because

2   we have to send off DNA comparison from the subjects that are

3   in custody to get that analyzed with any DNA that was from the

4   weapon.  We actually have a search warrant for -- for that as

5   well to initiate the swab -- buccal swabs for the subjects here

6   today.  So once we have that, then that will be sent off to the

7   lab for analysis.

8   Q    Okay.  So that might identify which persons held which

9   firearms, right?

10  A    Potentially, yes.

11  Q    Do you have -- so I guess what I'm really trying to figure

12  out though is do you have any description or pictures of the

13  firearms used actually in the course of the -- any of these

14  particular robberies that even once you -- that you'll be able

15  to match recovered firearms to particular robberies?

16  A    The -- the -- the photo we have of the June 20th of

17  Lorenzo Jackson getting out of the vehicle, we can clearly see

18  the firearm in his hand, which the still shot would be able to

19  identify the -- one of the firearms.  However, because of the

20  traumatic event with the victims, they could only identify that

21  it was just a big, large, black -- black or silver pistol that

22  was presented to them.

23  Q    So does that picture of the June 20th firearm match any of

24  the firearms recovered so far in this investigation?

25  A    I'm not sure right off the top of my head.

Oppedisano - Cross/Gallagher                    44

1  Q     And so Mr. Kelley was arrested -- I guess that's

2  June 21st, right?

3  A     Yes.

4  Q     Okay.  Was there an arrest warrant out for him at that

5  time?

6  A     Yes.  There was a pocket warrant out for the state side.

7  Q     And who was he with?  Was he with someone in the vehicle

8  at the time of this arrest?

9  A     Yes.

10 Q     Who was that?

11 A     Demarion Gadlin (phonetic).

12 Q     Okay.  And that person's not charged, right?

13 A     On the federal side, no.

14 Q     Okay.  Oh, that person hasn't had his --

15 A     Originally, he was charged on the state side, but he's --

16 he has not been charged on the -- on the federal side.

17            MR. GALLAGHER:  May I have just one second,

18 Your Honor?

19            THE COURT:  You may.

20            MR. GALLAGHER:  Okay.  Thank you, Your Honor.  Pass

21 the witness.

22            THE COURT:  All right.  Let me see the order here.

23 Counsel for Mr. Johnson.

24            MS. PASTORINI:  Thank you, Your Honor.  May I

25 proceed?

 1               THE COURT:  You may.

 2                        CROSS-EXAMINATION

 3   BY MS. PASTORINI:

 4   Q    Okay.  Let's talk about all the fed cases that are --

 5   federal cases that are filed and indicted against Mr. Johnson,

 6   they are basically a refile of the State's cases that are

 7   reflected in the pretrial release summary.  Is that right?

 8   A    I don't -- I don't really understand what you're asking.

 9   That might be a question --

10   Q    Okay.  There's a bunch of --

11   A    -- for my counsel.

12   Q    There were a bunch of cases listed in the pretrial release

13   documents that's -- that talked about the cases that were filed

14   in state court.  You have -- you filed these cases initially in

15   state court, right?

16   A    I don't.  Not me.  I don't have access to that.  That's, I

17   mean, my TFO.  That's why we work on a joint task force --

18   Q    I'm not sure -- you're going to have to help me with

19   some -- your TFO?

20   A    A task force officer who's --

21   Q    Okay.

22   A    -- assigned to my squad with the FBI, so they're attached

23   to the -- to the squad.  That's a local partner with Houston

24   PD, they -- he would file charges.

25   Q    He refiled the charges.

1   A    He filed the initial charges for the State.

2   Q    And then he -- and those charges are refiled and indicted

3   in federal court.

4   A    I can't speak on -- on his behalf on what he -- he charged

5   on the state side.  I don't work for the State.

6   Q    Well, did you -- you got your information from the State,

7   did you not?

8   A    We get the police reports and the information for that,

9   and I build a federal case, and that's when I speak to our --

10  my prosecutor, who's present today, who then -- we go through

11  the facts of that and determine what cases that she's going to

12  file.  Now --

13  Q    And --

14  A    Go ahead.

15  Q    You spoke with the prosecutor in the state cases.  Is that

16  right?

17  A    The -- my TFO did.

18  Q    Okay.  The TFO talked to them and saw their -- all the

19  doc -- all the cases they filed there and they -- it was

20  decided that it would -- those cases would be filed in federal

21  court.  Isn't that right?

22  A    I can't speak on that.

23  Q    Okay.  You don't know -- do you know any cases that are

24  filed in state court that are not filed in federal court?

25  A    Again, I can't speak on that.  I don't work for the State.

1  Q    All right.  Would it surprise you that there are none?

2  A    Again, I can't speak on that.

3  Q    All right.  The -- let's -- the -- there was -- in no --

4  none of these cases that are filed here in federal court did

5  the -- was the robbery committed with Mr. Johnson holding the

6  firearm.  Is that correct?

7  A    I don't know because the -- the -- I don't know that

8  answer because the victim was in shock during the robberies and

9  there was multiple firearms on -- at multiple incidences, so

10 the victims don't know who the subjects were.

11 Q    Okay.  You don't have any case filed against Mr. Johnson

12 where he used or exhibited a deadly weapon.  Isn't that the

13 truth?

14 A    I can't say that he wasn't holding a firearm, but I don't

15 have anything that right now that we're talking about that says

16 that he was holding a firearm --

17 Q    Right.  That's -- that's my --

18 A    -- present.

19 Q    That's the whole point --

20 A    Yes.

21 Q    -- in my question.

22 A    Sure.

23 Q    You don't have any evidence that he was using or

24 exhibiting a firearm during the commission of any of these

25 robberies, do you?

Oppedisano - Cross/Pastorini                    48

```
 1   A    No.
 2   Q    Okay.  All right.  The next question is let's talk about
 3   going all the way -- we'll skip over to the arrest where there
 4   was a firearm in the backseat of the car.  Who owned that car?
 5   A    I do not know.  I wasn't present for that scene.  The
 6   local law enforcement was dealing with that one -- with that
 7   incident.
 8   Q    It was on the backseat floorboard of the car, I think you
 9   told this Honorable Court.
10   A    Yes.
11   Q    Okay.  So you -- you're not -- you don't know if it was
12   the father's firearm or Mr. Johnson here that stands before the
13   Bar of Justice, or if it was a firearm that belonged to someone
14   else, do you?
15   A    I don't have that --
16   Q    Okay.
17   A    -- information.
18   Q    But my point is you have no information such as even
19   eyewitness or fingerprints or things that would indicate that
20   that gun in the car was Mr. Johnson's, right?
21   A    No, I don't have that information.
22   Q    Okay.  And the same thing, let's talk about was it -- was
23   the car owned by his dad?
24   A    I -- again, I don't know that information.  I wasn't on
25   the scene.
```

Oppedisano - Cross/Pastorini                    49

1   Q    And his dad, who's out there in the courtroom, he's the --

2   got his hand raised, he's not charged with anything, is he?

3   A    No.

4   Q    And your criminal history shows he's never been convicted

5   of anything.  Isn't that a fact?

6   A    Which person are you referring to?

7   Q    The gentleman who raised his hand.

8   A    I did not run his criminal history, so I do not know.

9   Q    Okay.  So -- but he -- but you have no indication that

10  he's ever been convicted of any crime, felony or misdemeanor,

11  do you?

12  A    The father you're speaking about?

13  Q    Yes.

14  A    I do not know.  He was not part of the investigation, so

15  he's not a subject of -- of our investigation, so I did not run

16  his NCIC.

17  Q    Okay.  He's certainly part of the investigation because

18  you told the Court that he was with his -- that Mr. Johnson was

19  with his father fishing at the time that y'all arrested --

20  A    When we went --

21  Q    -- Mr. Johnson.  He's, excuse me, seated behind me, right?

22  A    When we went to go -- when they went to go arrest your --

23  your client, he was with his father, yes, but his father was

24  not part of the investigation where we would run NCIC on the

25  federal side.  Now, whatever state and local did to -- on their

ACCESS TRANSCRIPTS, LLC            ⚖            1-855-USE-ACCESS (873-2223)

Oppedisano - Cross/Pastorini                    50

1  end to see if he had any wants or warrants out for his -- for

2  his arrest, I don't -- I can't speak on that.  I wasn't

3  present.

4  Q    And you are -- let's talk about you -- there's nobody --

5  as you said, you volunteered that everybody was shook up about

6  having a gun pulled on them, I don't doubt that, but there's

7  nobody that said the guy in the blue jacket pulled a gun on

8  them, did they?

9  A    I -- I can't -- I don't have that information off the top

10 of my head.  I'd have to go through all the -- all the

11 incidences.

12 Q    Okay.  Without going through --

13 A    There's 19 of them, so there's a lot of information

14 that -- and during the interviews and police reporting for me

15 to have that knowledge.

16 Q    Well, there's only six that applies to me -- to my client,

17 as far as I understand your testimony already.  Is that fair?

18 A    Well, the ones we're talking about today were the -- the

19 ones that are charged, but again there was 19 incidences that

20 had multiple people that we did not charge in that incident.

21 Q    Okay.  Well, if you had --

22 A    But he's -- he's --

23 Q    If you had evidence that he was involved in other -- in

24 more than six robberies, you would've -- and there's only

25 really three robberies and then three cases of enhanced because

ACCESS TRANSCRIPTS, LLC                        1-855-USE-ACCESS (873-2223)

1   it's -- there was a use or exhibiting of a federal -- excuse

2   me, of a firearm.  Isn't that right?

3   A    Like what was stated earlier, there was -- we can tie your

4   client to five --

5   Q    To five -- to five --

6   A    -- instances.

7   Q    To five what?

8   A    Five reports, five incidences.

9   Q    Okay.  And in none of the five do you have any indication

10  that he ever used or exhibited a deadly weapon.  Isn't that the

11  truth?

12  A    I'd have to go through every single one of the HPD reports

13  and -- and review all the notes in order to talk about --

14  Q    Let's talk --

15  A    -- incidences that are not charged in this charging

16  document today.

17  Q    Let's talk about your present recollection as you sit here

18  testifying at this hearing.  You don't have any indication

19  that -- that he used -- or he personally used or exhibited a

20  deadly weapon, or you would've told the Judge that.  Wouldn't

21  that be a fair statement?

22            MS. COLLINS:  Objection to asked and answered at this

23  time, Your Honor.

24            THE COURT:  Yeah.  We -- you've gone over it.

25  There's an indictment in the case.  He's indicted for aiding

Oppedisano - Cross/Pastorini                    52

1  and abetting, using and carrying a firearm or a dangerous

2  weapon in relation to a crime of violence.  You've made your

3  point about the amount of evidence that there is to support it,

4  but I have an indictment on multiple counts.

5  BY MS. PASTORINI:

6  Q    But did you ever have any testimony from any of your

7  witnesses that the guy in the blue jacket used or exhibited a

8  firearm?

9         MS. COLLINS:  Objection.  Asked and answered.

10        THE COURT:  Yes.  It's been asked and answered,

11  Ms. Pastorini.

12  BY MS. PASTORINI:

13  Q    All right.  The next thing I'd like to know is that when

14  he would -- when my client was arrested out at the fishing hole

15  with his dad, I guess it was the fishing hole, where was the

16  fish -- where were they fishing?

17  A    I believe it was Seabrook, if my memory is serving me

18  correct.

19  Q    Okay.  And he didn't make any -- he never attempted to

20  pull a gun on you or the people that arrested him, did he?

21  A    Again, I wasn't present, but no, he went into custody

22  without incident.

23  Q    Went into custody without incident.  Okay.  Let's -- and

24  then my client never -- you have no indication from any of

25  these victims that my client ever attempted or did sexually

Oppedisano - Cross/Pastorini                                          53

1   assault any of them.  Isn't that a fair statement?

2   A    Yes, according to -- yeah, that's a fair statement.  Just

3   his confession talking about him being present during a sexual

4   assault where he didn't stop Kenneth Kelley from doing it.

5   Q    Well, okay.  He didn't stop somebody from doing it and --

6   but you're not saying that he had anything -- he didn't

7   participate in any manner in any sexual assault of anyone

8   during these robberies.  Isn't that a fair statement?

9   A    That's a fair statement.

10  Q    Okay.  And additionally let's talk about he didn't -- we

11  don't -- you said there -- you have no indication that he had

12  a -- you don't have any recollection of him using the --

13  anybody saying that the guy in the blue jacket used or

14  exhibited a weapon.  No sexual assault.  Do you have any

15  indication that he personally ever threatened verbally any of

16  the victims in this case?

17  A    I cannot speak on that just because the victims again were

18  in a situation that there was a lot of commotion going on in

19  the vehicle and multiple people talking and going through that,

20  so I don't think they were able to decipher which exact person

21  said what.

22  Q    Well, in --

23  A    They just heard the words of --

24  Q    Just --

25  A    -- what they were told about being threatened.

1    Q    Just a fair statement, because of whatever reason, you

2    have no indication that he personally threatened anyone.  Isn't

3    that a fair statement?

4    A    That's a fair statement.

5    Q    Okay.  The -- how did y'all know that he would be at the

6    fishing hole in Seabrook or wherever it was?

7    A    Again, that was based -- the way -- so the way this works

8    is we divvy up which subjects we're going to go after.  We

9    create a team.  That team and that person that's in charge of

10   that operation, if you want to call it, would figure out all

11   those factors and conduct surveillance and do their own thing

12   while we were doing what we were doing.  So I was not again

13   present for that or had knowledge of how -- what they were

14   doing to go and apprehend him.  I know that they located the

15   vehicle down by the fishing hole, if that's what you want to

16   call it, and they -- they got eyes on your client and they

17   wanted to take him into custody, so they did.

18   Q    You said the vehicle.  What do you mean the vehicle?

19   A    Like, they -- they got eyes on -- on like the -- the

20   vehicle that I guess he was potentially going to be in, which

21   was I believe his father's, if that was his father's, which I

22   don't know.

23   Q    Okay.  But make -- I'm going to make sure that we don't

24   leave a misimpression with this Honorable Court that you had

25   any indication that the vehicle that he and his father drove to

1    the fishing hole with was in any way tied to any of these

2    robberies.

3    A    No.

4    Q    You don't have any indication of that, do you?

5    A    No, no.

6    Q    In fact, you don't -- there's no indication that any of

7    those guys had any cars.  Isn't that a fair statement?

8    A    Which guys are you talking about?

9    Q    The people that are charged with the robberies, that are

10   indicted in this case.  They were using Lyfts and Ubers, right?

11   A    I mean, yeah, that's what the case was based off of,

12   aggravated robberies to Lyft --

13   Q    Right.

14   A    -- and Uber drivers.

15   Q    So you're not saying that the car at the fishing hole

16   was --

17           MS. COLLINS:  He did not say that the car was used in

18   any of the robberies.

19   BY MS. PASTORINI:

20   Q    All right.  There's no evidence of Ke Shaun using any

21   physical restraint on any of the victims.  Isn't that a fair

22   statement?

23   A    If you're considering not letting them go, physical

24   restraint of a weapon, which I can't say he was holding or not

25   holding, but the -- the victims were not free to leave the

1   vehicle.

2   Q    Yeah, but you never -- but no --

3   A    There was no -- there was no confinements of, like,

4   handcuffs or ties or something, if that's what you're referring

5   to.

6   Q    Zip ties or --

7   A    No.

8   Q    -- holding them down and not letting them leave or any of

9   that stuff --

10  A    No, there was no --

11  Q    -- by my client.

12  A    There was no evidence of that.

13  Q    Okay.  Did you ask that the gun, that any of these -- the

14  guns that were recovered, did you ever ask that those guns be

15  printed, fingerprinted?

16  A    I believe they -- I think they're -- I believe they were

17  in the -- still in process of being printed.

18  Q    So at this point in time, you have no proof of any -- that

19  my client ever even touched a handgun.  Isn't that a fair

20  statement?

21  A    At this time, not yet, no.

22  Q    All right.  And on that sexual assault, there was -- that

23  woman never said that anybody held her down and made her do

24  these things --

25              THE COURT:  Okay.  Ms. Pastorini --

 1          MS. PASTORINI:  -- but somebody pulled a gun, right?

 2          THE WITNESS:  I mean, she was held at gunpoint while

 3    she performed oral sex.

 4    BY MS. PASTORINI:

 5    Q    That's what I just said.  I'm just asking a very -- I

 6    said, other than being held at gunpoint by Mr. Kelley, there

 7    was no indication that anybody else held her down, is there?

 8    A    No.  Not --

 9    Q    Okay.

10    A    No.

11    Q    Just -- thank you.

12          THE COURT:  Just keep in mind we have two other

13    attorneys who need to ask questions of the witness.

14          MS. PASTORINI:  Thank you, Your Honor.  I will.

15    BY MS. PASTORINI:

16    Q    Are you aware that prior to filing the charges against my

17    client, that he's never been charged with anything in his life?

18    A    For his past criminal history, yes.

19          MS. PASTORINI:  And I think I'm about through, Judge.

20    I just need to recheck my notes briefly, if you don't mind.

21          THE COURT:  Okay.

22        (Pause)

23    BY MS. PASTORINI:

24    Q    And I believe you talked about somebody -- oh, it was

25    Tucker that had the ankle monitor, right?

Oppedisano - Cross/Thomas                    58

```
 1  A    Yes.

 2  Q    But my client didn't have an ankle monitor, did he?

 3  A    No.  Just because you -- you know, you alluded that there

 4  was no criminal history, so I don't have any reason to believe

 5  that she had -- he had an ankle monitor on.

 6  Q    Okay.  Good.  Thank you.

 7            MS. PASTORINI:  I believe I'm ready to pass the

 8  witness.  Thank you, Your Honor.

 9            THE COURT:  Thank you, Ms. Pastorini.

10            Counsel for Mr. Jackson?

11            MR. THOMAS:  Thank you, Judge.

12                      CROSS-EXAMINATION

13  BY MR. THOMAS:

14  Q    Agent, good morning.

15  A    Hey, how are you doing?

16  Q    I'm good.  Let me ask you about the arrest of Lorenzo

17  Jackson.  You said that --

18  A    Sure.

19  Q    -- you were at the -- actually at the residence that day

20  and participated in the execution of that arrest.  Is that

21  right?

22  A    Yes.

23  Q    When he was arrested, you said that that was in a location

24  by a tree pursuant to what Mom had told you, right?  Like, he

25  was behind -- near a tree or something like that?  That's how
```

Oppedisano - Cross/Thomas                                    59

1  y'all found him?

2  A    Yeah.  Her -- his mother had no idea where he actually ran

3  off to.  We just -- she knew he obviously ran because we came

4  to the house and told her, like, hey, we have an arrest warrant

5  for your son.  We're looking for him.  I need you to call him.

6  I think she tried several attempts, and his phone was off at

7  that -- at that time, or not going through.  And then I had

8  asked -- I told her the importance of what's going on with the

9  investigation because she had no clue of -- of any of this that

10 was happening.

11      And then that's when she had -- after a long talk and a

12 while had passed of us trying to search for him, she -- I had

13 said we'll move back towards the perimeter, if you can just try

14 and find him.  If not, within ten minutes, we're -- we'll have

15 canine and we're going1 to end up, like, coming in and trying

16 to use canine to try and track him down.  And that's when

17 within, I don't know, a matter of minutes of me moving back to

18 the perimeter is when she called and said, he's on this block.

19 You can come over here.  Just let's do it peacefully.  Let's

20 try not make, you know -- I said, that's fine.  Let's just have

21 him come out and surrender.  And that's happened.  We ended up

22 going over there and he came out from behind the tree and bush

23 area and was taken into custody without incident.

24 Q    So I guess what I'm trying to figure out is did Mom -- Mom

25 basically helped y'all lead law enforcement to where

```
 1   Mr. Jackson was?
 2   A    Yes.
 3   Q    Okay.  Did he have a phone when he was taken into custody?
 4   A    No.
 5   Q    Okay.
 6   A    He left the -- we watched him leave the house with a
 7   phone.  He did not have a phone on him during the time of his
 8   arrest.
 9   Q    And I recall you testified earlier that you believe he had
10   what appeared to be a firearm on his person as he left the
11   residence?
12   A    Yes.  We did not see the physical firearm.  We saw the
13   outlining of what we believed was a firearm just based off our
14   training and experience, but we don't have any proof that that
15   actually occurred.
16   Q    Okay.  And that's what I was going to ask.  So as you're
17   establishing your perimeter at your scene there, were -- I
18   assume the efforts were made to try to locate what might have
19   been in his possession?
20   A    Yes, we did.  There was several residents that were not
21   home, not to go into their obviously backyard on to their
22   dwelling, so we could not get back there.
23   Q    Okay.
24   A    But efforts were made to look for and locate the phone
25   and/or gun that we believe we saw in his pocket of his
```

1    sweatshirt or pants.

2    Q    And you mentioned that he had left in a vehicle.  Was that

3    vehicle ultimately searched once the driver was cooperative

4    with your investigation?

5    A    It was -- it was not searched.  The -- the -- the --

6    the -- that individual was let go because he was cooperative

7    and gave us -- told us -- he acknowledged who was there and --

8    and was able to acknowledge there was a second person when he

9    originally said there wasn't.  So he was let go of -- of there.

10   I believe it was not searched.  I -- there was I believe a --

11   just a cursory look on the outside to make sure there was no

12   weapons in plain view, but nothing was found.

13   Q    Thank you.  Now, I kind of wanted to ask, you mentioned

14   earlier that -- and I think it was just described by the

15   prosecutor as he was fleeing the house.  Was he contacted

16   directly before this date to let him know that charges had been

17   filed and that he needed to turn himself in?

18   A    No.

19   Q    Okay.  With regards to the -- you mentioned there was

20   two -- well, you've described two incidents specifically today

21   with regards to Mr. Jackson.  The June 20th incident you

22   mentioned at a gas station, there's a video of him exiting, I

23   believe, the complainant's vehicle.

24   A    Yes.

25   Q    Do you recall that?

Oppedisano - Cross/Thomas                    62

1   A    Yes.

2   Q    Okay.  Have you personally witnessed that video?  Like,

3   you can --

4   A    Yes, I personally watched that video.

5   Q    And --

6   A    And actually, at 10 -- 10:59 p.m. is when he exits the

7   vehicle on the back right side of the passenger vehicle.

8   Q    Okay.  And is his face clearly identifiable in the -- that

9   video?

10  A    Yes.  He has a hood on.  He has a hood on, and he enter --

11  he exits the vehicle with a weapon displayed where you can

12  actually see the weapon.  And he gets out and then proceeds to

13  get in the front.  And that's when -- that's when Kenneth

14  Kelley had came back to the vehicle after she had departed the

15  vehicle to go lock herself in the restroom until police arrived

16  or until somebody helped her out.

17  Q    Okay.  And my understanding is Kelley is the one arrest --

18  he's arrested in that vehicle the following day, or fleeing

19  from the vehicle that following day.

20  A    Yes.

21  Q    Is that right?  Okay.

22  A    Yes.

23  Q    And my client wasn't with him that next day?

24  A    The next day, no.

25  Q    Okay.  On the June -- the earlier incident, the

Oppedisano - Cross/Thomas                           63

1    June 13th --

2    A    June 13th?

3    Q    -- I believe you mentioned that he was identified in a

4    photo array by the complainant.  Is that right?

5    A    Yes.

6    Q    And you mentioned that there's I believe tower -- cell

7    tower information connected here?

8    A    Cell phone presence.

9    Q    Was that information that you gathered through, I guess, a

10   subpoena or grand jury subpoena or something like that, or how

11   did you get that information.

12   A    The data you're speaking of?

13   Q    Yes.

14   A    It was through a search warrant for data location between

15   certain dates, which then provided enough data where that it

16   would all have to be mapped and that specific date populated

17   for cell phone presence.

18   Q    Thank you.  You mentioned in the course of your

19   investigation that you would have run NCIC on these -- the

20   gentlemen that are here that are charged in this case.  Is that

21   right?

22   A    Yes.

23   Q    Okay.  And it's true that Mr. Jackson has no prior

24   criminal convictions.  Is that right?

25   A    Correct.

Oppedisano - Cross/Shields                                64

1  Q    And in the course of your lead-up to the arrest, you are

2  aware that he resided in Houston, Texas with his mom and dad,

3  right?

4  A    Yes.  His sister lived there as well, who was dating

5  Demarion Gadlin, who was part of the arrest on the 21st in that

6  stolen vehicle.

7  Q    Okay.  But as far as you know, he's a lifelong resident of

8  Houston, to the information that you have?

9  A    I don't know if he was a lifelong resident.  I just know

10  he lived at that location, so I -- I --

11  Q    I mean, if you were going to find somebody, one of the

12  things you would do as a member of law enforcement is to run

13  like a CLEAR report or some kind of report to determine his

14  residence history, fair?

15  A    Fair, sure.

16  Q    Okay.  Did you find anything that indicated that

17  Mr. Jackson had ever lived outside of the Houston area?

18  A    No.

19           MR. THOMAS:  Judge, I'll pass the witness.

20           THE COURT:  Thank you, Mr. Thomas.

21           Ms. Shields?

22           MS. SHIELDS:  Just a few questions, Your Honor.

23                    CROSS-EXAMINATION

24  BY MS. SHIELDS:

25  Q    Special agent, the date of the arrest of Mr. Tucker, what

Oppedisano - Cross/Shields                          65

1  was that date?

2  A    I believe it was June 15th.

3  Q    Of 2023?

4  A    Yes.

5  Q    And you were not present on that scene.  Is that correct?

6  A    No, I was not.

7  Q    Okay.  But you're familiar with the details of it to some

8  degree?

9  A    Some degree.  I wasn't present on that.  I just know that

10 he was taken into custody and there was another individual

11 present, a juvenile.

12 Q    Okay.  So there was somebody else in the car?

13 A    Yes, I believe so.

14 Q    Okay.  Was that person arrested for anything to your

15 knowledge?

16 A    Not that I -- during that incident, while he was arrested,

17 if my memory serves me correctly, I believe he was arrested

18 because of the firearm.  In the presence of -- of him, he had a

19 firearm.  So I think he was taken into custody for that, but

20 not for this specific --

21 Q    Not to these --

22 A    -- charges, yeah.

23 Q    -- related charges.

24 A    Correct.

25 Q    Okay.  So the juvenile was arrested for the presence of

1   the firearm?

2   A    I believe so, yes.

3   Q    Okay.  And Mr. Tucker's phone, I believe you said earlier

4   that you had run warrants for everyone else's phone.  Have you

5   still not run any warrants for Mr. Tucker's phone?

6   A    Give me -- just give me one second, please.

7   Q    No problem.

8   A    So the information that we ran for his phone was the CDR

9   search warrant for the data location of the phone number.  But

10  the physical phone, if that's what you're alluding to, no.

11  Q    Okay.  Did you ever recover his physical phone?

12  A    No, I do not believe so.

13          MS. SHIELDS:  I'll pass the witness, Your Honor.

14          THE COURT:  Thank you.  Any redirect, Ms. Collins?

15          MS. COLLINS:  No, your Honor.

16          THE COURT:  All right.  You may step down.

17      (Witness excused)

18          THE COURT:  Are there any other witnesses for the

19  Government?

20          MS. COLLINS:  No, Your Honor.

21          THE COURT:  Mr. Gallagher, do you have any witnesses?

22          MR. GALLAGHER:  No witnesses, Your Honor.

23          THE COURT:  Okay.  Are you going to make a proffer?

24          MR. GALLAGHER:  Only the one I referred to earlier,

25  that I've been in contact with Mr. Kelley's mother who he had

1    stayed with part of the time prior to his arrest eleven months

2    ago, and that she is willing to be a third-party custodian, and

3    she is willing to have him in the house.

4          THE COURT:  Okay.  Thank you.  And was he living

5    there prior to his arrest and --

6          MR. GALLAGHER:  She advised that he was partly

7    living -- he had been living with her part of the time.  He had

8    also been living with a family member who was expecting a

9    child, and so he was splitting time somewhat prior to his

10   arrest.

11         THE COURT:  All right.  Thank you, Mr. Gallagher.

12         All right.  Ms. Pastorini, do you have any witnesses?

13         MS. PASTORINI:  Judge, I have -- I could make a

14   proffer in the interest of time that it might not take to long,

15   if that --

16         THE COURT:  Okay.

17         MS. PASTORINI:  -- if you prefer.  I do have his

18   father here and his father's wife, that -- which is not his

19   mother, but there -- he's here.  He has -- he's never been

20   convicted of any crime, felony or misdemeanor.  He would

21   allow -- if you were to allow this young man to be placed on

22   supervised release, he would allow him to live in his home and

23   he would watch him 24/7.

24         He goes to work every day as a local delivery man on

25   a -- with an 18-wheeler.  He never leaves the jurisdiction of

1  Harris County, but he does drive locally, and he would make

2  sure that his son went with him everywhere if that was the

3  ruling of the Court.  He would -- he's got a wife now.  I guess

4  it's -- I don't know if it's his girlfriend or his wife, but

5  they've been together in a committed relationship for a number

6  of years.  And if ever he had to go anywhere that he couldn't

7  take his son, his wife would be the -- able to be there with

8  the young man in the house.

9            They have -- he has no objection to electronic

10 monitoring and any other restrictions that you might put on him

11 in order to grant him supervised release.  And, Judge, I don't

12 know.  I think I did prove up that he has no criminal history,

13 and I wanted to just reiterate that.  I didn't know if I did or

14 not, but the proffer -- I think that --

15            THE COURT:  I've taken judicial notice of the

16 Pretrial Services report.

17            MS. PASTORINI:  That's all I have to say.

18            THE COURT:  There aren't any convictions on it, just

19 other charges.

20            MS. PASTORINI:  Thank you, Judge.  That's all I have

21 to say.

22            THE COURT:  Thank you, Ms. Pastorini.

23            Mr. Thomas?

24            MR. THOMAS:  Judge, we have no witnesses.  I didn't

25 know if you want to hear argument now or reserve that to the

1  end.

2          THE COURT:  I'm going to reserve that until the end.

3          MR. THOMAS:  Thank you, Judge.

4          THE COURT:  So any evidence other than --

5          MR. THOMAS:  The only thing I'd make -- I'd ask the

6  Court to consider the information in the Pretrial Services

7  report.  In addition, I did make contact with his -- my

8  client's girlfriend, who indicated that he would be allowed to

9  stay with her in the Houston -- in Houston if the Court granted

10  bond, and that would be our proffer.  Thank you.

11          THE COURT:  Thank you, Mr. Thomas.

12          And Ms. Shields?

13          MS. SHIELDS:  Your Honor, I would just have a

14  proffer.  Mr. Tucker's mother is present, but I've also spoken

15  with his father.  They live together in Manvel.  Mr. Tucker is

16  welcome to come back to the home.  They are both willing to be

17  third-party custodians if approved by this Court, with a

18  request or an understanding of home confinement would most

19  likely be the term of release, and they agree to that.

20          THE COURT:  Thank you.  All right.  I'm ready for

21  argument.

22          MS. COLLINS:  Yes, Your Honor.  Your Honor, I'd ask

23  that you take consideration of a few things.  First of all, the

24  degree of the complexity of the underlying offenses.  These are

25  not quick-hit robberies, in and out, or one-time quick-hit

1    robberies.  This is a series of aggravated robberies in which

2    each of these defendants, on more than one occasion,

3    participated in holding and kidnapping, holding hostage Uber

4    and Lyft drivers for a period of time, literally driving around

5    with them in the vehicle, taking them to multiple locations,

6    again all while holding them at gunpoint, to steal thousands of

7    dollars' worth of money, goods, and cash from these victims.

8          I understand the Court's concern about the age of

9    these individuals, and probably the lack of criminal history

10   for most of them, but I do not think that negates the

11   seriousness of the underlying offenses.  I would also take into

12   consideration the fact that, at a young age, we can all see

13   making a mistake one time, walking away, realizing what we've

14   done, and saying, wow, that was a bad idea.  I'm not ever going

15   to do it again.

16          That does not represent any of the defendants that

17   are sitting in front of you.  All of them went through the

18   process of kidnapping, holding hostage, and robbing these

19   victims, and then chose to do it again and again and again, up

20   to eight times by one of these men, Kenneth Kelley.

21          And I would also argue, Your Honor, that as these

22   cases go along, the seriousness of the offenses increases.  We

23   know that after several times of committing these robberies,

24   Kenneth Kelley and Ke Shaun Johnson participate in another

25   robbery in which a woman is sexually assaulted.

1          And defense counsel has stated that somehow, I guess,

2    implied that Ke Shaun Johnson has some kind of less credibility

3    in that fact just because he wasn't the one committing the

4    sexual assault.  But I want the Court and ask the Court to take

5    into consideration the type of individual who continues to rob

6    and ride around with a woman while she's being sexually

7    assaulted by another individual.  That is Ke Shaun Johnson.

8    That is what he is capable of.

9          And, Your Honor, I'd also ask you to take into

10   consideration that we're talking about Uber and Lyft

11   situations.  These are situations where people are literally

12   going -- these victims are going to the homes, going to the

13   apartment complexes of these defendants.  Even if there was

14   location monitoring, even if they were under home confinement,

15   it would not prevent these types of victims from being ordered

16   and called out to these individuals' homes in a time that

17   there's nothing that this Court or law enforcement would be

18   able to do to prevent these offenses before they were actually

19   committed.

20         In addition, Your Honor, Kenneth Kelley specifically

21   is seen riding around in one of the stolen vehicles.  He flees

22   from law enforcement.  He is taken into detention.  However,

23   again, they find a loaded gun, a series -- a repeating series,

24   if you will, of facts in this case.  He's found with a loaded

25   gun after fleeing from police.  The same with Ke Shaun Johnson.

1          Again, my concern, Your Honor, is, one, defense
2    counsel has made mention of the defendant's father.  I would
3    first point out that that individual has not been run or
4    reviewed by Pretrial Services.  Nonetheless, what we do know is
5    that he's willing to have a firearm in plain view in a vehicle
6    with his son at the time that he is, in fact, arrested --
7    Ke Shaun is arrested, a loaded weapon.

8          Again, and with all of these families, I'm sure
9    they're all good people, Your Honor, but these defendants, all
10   four of them, were in some degree living with their families at
11   the times they were committing multiple robberies.  Despite
12   what I'm sure was best efforts by each of these families to
13   prevent their sons from committing these crimes, they were
14   unable to do so.

15         In addition, we know that Lorenzo Jackson's mother,
16   when she's approached, will not cooperate with local law
17   enforcement.  They literally had to have HPD leave the scene in
18   order for her to even speak to the FBI agent in this case.  And
19   once she does, I certainly agree that she then cooperates with
20   the FBI agent and helps them find her son, but that's only
21   because her son has fled.  He has seen law enforcement there,
22   and he has fled the scene, ditching a firearm and a cell phone
23   in the process, evidence of his crimes.

24         And again we then get to Nyreon Tucker, who is on
25   bond for another aggravated robbery when he is found in

1    possession of a loaded gun while he's also committing these new

2    offenses.  He's made clear through his actions that he will not

3    abide by any rules that are put in place by a court.

4           Your Honor, the complexity of these offenses, the

5    number of these offenses, the seriousness of these offenses

6    alone shows the danger to the community that each of these

7    individuals can have if they are released.

8           In addition, I would, again, repeat to the Court that

9    these are all individuals that are being asked to go back to

10   exactly where they came from, to exactly the same homes that

11   were unable to prevent them from committing these crimes, to

12   the same homes where these Uber and Lyft drivers were often

13   called to, to become victimized.

14          And each of them in their own way have -- Kelley,

15   Lorenzo, Nyreon have all at some time fled from law enforcement

16   showing again flight.  I do not believe, and I would submit to

17   this Court, that there is no condition or combination of

18   conditions that would prevent them from being a danger to the

19   community.  And, further, I would argue that at least Kenneth

20   Kelley, Lorenzo Jackson have shown that they are also a flight

21   risk in this community.  That's all, Your Honor.

22          THE COURT:  Thank you, Ms. Collins.

23          Mr. Gallagher?

24          MR. GALLAGHER:  Thank you, Your Honor.

25          THE COURT:  And can you -- and for each defense

1    counsel, I would like in your argument for you to tell me

2    exactly the evidence that you are relying on to rebut the

3    presumption of danger to the community.

4            MR. GALLAGHER:  Yes.  And so for Mr. Kelley, as I

5    think I alluded to earlier, I think the -- regarding the risk

6    of flight, I think the evidence regarding his connections to

7    the community are clear from the pretrial report, so I won't go

8    into those further.

9            His -- regarding the danger to the community, he is a

10   young man who has not previously been convicted.  He has a

11   stable place to live.  He -- the Court has available to it

12   quite strict conditions that will mitigate those concerns.

13   Those aren't always true.  The Court sometimes doesn't have

14   those for people who are homeless, don't have a stable

15   residence.  Those things are true for Mr. Kelley.

16           So, for instance, with an ankle monitor, that would

17   make sure that, if Mr. Kelley leaves his home without

18   permission, that it would be known.  There's no reason to think

19   that he's of any harm to anyone when he's inside his home.  And

20   as soon as he leaves his home without permission, he would be

21   in violation of the Court's orders and would be brought back

22   into custody quite quickly.

23           And the consequences hanging over his head for that

24   are significant.  So the penalties for violating the Court

25   orders, the strict conditions that the Court can impose with

1    reliable monitoring, I think mitigate or prevent the Government

2    from showing by clear and convincing evidence that he -- that

3    the Court cannot set conditions that will ensure the safety of

4    the community.

5             And as the Government has mentioned, this is -- there

6    is a series of events, and the Court -- there are serious

7    concerns, obviously.  There's no dispute about any of that.

8    But that said, Mr. Kelley is not someone who's been in

9    violation of court orders before.  He is not someone who has

10   failed to appear for any court proceedings.  He is not someone

11   who has an unstable background.  And so all those factors show

12   that the Court can (indiscernible) conditions that would

13   prevent -- ensure the safety of the community, Your Honor.

14             THE COURT:  Thank you, Mr. Gallagher.

15             Ms. Pastorini, again I want to know exactly what

16   evidence you're relying on to rebut the presumption of danger

17   to the community.

18             MS. PASTORINI:  All right.  Thank you, Judge.  One

19   thing I want to point out initially is that, with a father with

20   no criminal convictions at all, it would not be unusual for a

21   man to go to a fishing hole and take a gun in case he was --

22   had issues with snakes.  This is South Texas.  There's no

23   evidence that my client ever touched that gun or knew anything

24   about it being on the floorboard in the back seat of the car.

25             The next thing I want to point out is he didn't live

1  with his father when this took place.  He was living with his

2  mother, who lived and operated north of town, as reflected in

3  that in that sentence -- presentence investigation thing.  She

4  would not be the custodian.

5          We would not -- we're not asking that that be done.

6  We are asking that the third-party custodian be his father, who

7  is in a stable relationship, fully employed, who drives locally

8  a delivery service here in Houston.  That electronic monitoring

9  would certainly -- he's not shown any sign that any -- that

10 electronic monitoring would not be a beneficial tool to the

11 Government to keep tabs on if and where he is.  He's -- the dad

12 is -- the dad lives here in -- inside the city of Houston.  And

13 that would be certainly an easy thing to do is to make that

14 electronic monitoring an important thing to have there.

15         There's not -- I asked repeatedly about there -- what

16 did my client, was he -- is there any evidence that he ever

17 possessed or had a gun or used a gun, and I'm not minimizing it

18 just because it -- that he didn't, but there's no evidence from

19 anyone that he used the -- he used or possessed a deadly weapon

20 during any of these things.

21         The fact that -- and there were two people in the car

22 when this poor woman was sexually assaulted, but I want to

23 point out one thing.  My -- there's no evidence that this man

24 put on in the -- in his testimony that showed that my client

25 did anything to assist in the sexual assault committed by

```
 1   Mr. --

 2             THE COURT:  He drove the car while the sexual assault

 3   was occurring.  He was the driver of the car.

 4             MS. PASTORINI:  But he didn't -- okay.

 5             THE COURT:  Okay.  All right.

 6             MS. PASTORINI:  All right.

 7             THE COURT:  All right.

 8             MS. PASTORINI:  That was just my position on that,

 9   Judge.

10             THE COURT:  Okay.

11             MS. PASTORINI:  He's the -- I just wanted to say

12   that -- I wanted to point that out, I guess.  I don't know.

13   There's -- I don't see any -- and I want to point out though,

14   Judge, out of all that testimony, there was no evidence, no --

15   nothing brought up that my client ever possessed a gun or used

16   it in any way other than as it would be in the law of parties

17   with Mr. Kelley having done so.

18             But, Judge, I just think the fact that he has no --

19   ever -- there's not even any juvenile or delinquent testimony

20   in that he -- the sentencing, the PSI -- I mean, the

21   presentence report that was here, it was not -- it was not

22   pointed out that there were any things that he would do that

23   would make him in any way a flight risk.  He has nowhere to go.

24   His mother lives in the Humble area and his father lives here

25   in Houston.
```

```
 1              Anyway, I just ask that he be granted, with
 2     restrictions, the right to return to his home and honor the
 3     demands of the Court.
 4              THE COURT:  Thank you, Ms. Pastorini.
 5              Mr. Thomas?
 6              MR. THOMAS:  Thank you, Judge.  With regards to the
 7     danger to the community, my client does have no criminal
 8     convictions whatsoever.  He is a resident of Houston, lifelong,
 9     and has family and a girlfriend to support him.  Certainly we
10     understand the allegations in this case are serious and the
11     Court takes them seriously.
12              The evidence proffered by the Government doesn't
13     demonstrate how my client used a firearm in any particular
14     manner.  Certainly, there is evidence of him possessing one in
15     the video that's described, but not anything particular as to
16     like an identification by any witness to my client displaying
17     or brandishing a firearm with regards to any particular
18     complainant.
19              Judge, we would ask that the Court set conditions of
20     home confinement with ankle monitoring in this case as
21     sufficient conditions to protect the public as well as the
22     complainants.  And that would be our request.  Thank you.
23              THE COURT:  Thank you, Mr. Thomas.
24              Ms. Shields?
25              MS. SHIELDS:  Your Honor, as to Mr. Tucker, there was
```

1  only evidence presented for -- that Mr. Tucker was involved in

2  one incident as opposed to some of the codefendants in this

3  situation, and I want to make that clear.  And he's only

4  indicted in one count.

5          And when they talked about the arrest, well, there

6  was a gun found.  The juvenile who was also present in the car

7  was arrested for that firearm.  There was no evidence that

8  Mr. Tucker at any point in time during that incident was in

9  possession of that weapon.  And he cooperated with the arrest.

10          And even though he does have prior arrests, no

11 convictions, there's no indication that he's ever tried to flee

12 or evade law enforcement in any way.  The evidence, I believe,

13 that shows that the -- he can -- the community would be

14 adequately protected comes from the Pretrial Services report.

15          He has no prior convictions.  His connections are

16 completely to the community.  His family lives in Manvel.  His

17 mother lives in Manvel.  His father lives within that home.  He

18 has siblings there that he's very close to.  They have both

19 said that he could live in that home.

20          They are both willing to be screened by this Court to

21 see if they would be -- meet the standards for a third-party

22 custodian.  And they both agree that a home confinement with

23 GPS, if that's what's ordered by the Court, that he would not

24 be allowed to leave the home.  They would make sure that he

25 didn't leave the home.  And obviously an active GPS would alert

```
 1   if he chose to violate that in any way.  We believe that those
 2   conditions would be adequate to show that the community would
 3   be protected if he was released.
 4             THE COURT:  Thank you, Ms. Shields.
 5             All right.  I'll start with Mr. Tucker.  Mr. Tucker,
 6   I find that the United States has met -- well, as to all
 7   defendants, I believe that the United States has met its burden
 8   to show by clear and convincing evidence that there are no
 9   conditions that can reasonably assure the safety of the
10   community.
11             My reasoning as to each defendant differs slightly,
12   but in large part my decision is based on multiple, repeated,
13   with the exception of Mr. Tucker, who's charged in two counts
14   in the indictment, one for the interference with commerce by
15   robbery and one for the use or brandishing of a firearm in
16   connection with that robbery.  Everyone else is charged or I
17   heard evidence today is involved in multiple robberies that
18   include threats to victims, putting weapons -- pointing weapons
19   to victims.  I heard testimony about one incident which
20   involved the victim taking hold of the firearm to point it to
21   the ceiling and crashing a car.
22             These are not just simple little incidents that any
23   one person made a mistake or two mistakes.  These are multiple,
24   consistent, repeated dangerous robberies, putting victims in
25   danger and threatening victims.  And then you add on top of
```

1    that the incident involving Mr. Kelley and Mr. -- I believe

2    it's Mr. Johnson with the sexual assault.  Clear to me all of

3    this is clear and convincing evidence that there are no

4    conditions that I can impose that would reasonably assure the

5    safety of the community.

6            Again, we don't have any interviews with Pretrial

7    Services to qualify people as third-party custodians, but as

8    pointed out by the Government in argument, these individuals

9    are being asked to return to the same homes that they were

10   living in at the time that these incidents occurred, perhaps

11   with the exception of Mr. Johnson.  I don't have any

12   information regarding Mr. Johnson's father.  Everything in the

13   Pretrial Services report is about him working for his mother's

14   trucking business.

15           The -- with respect to Mr. Tucker, who again is

16   charged in two counts, he was on a GPS monitor on bond when

17   these counts that he's charged with took place.  So there's no

18   doubt in my mind that there are no conditions with respect to

19   Mr. Tucker that I can impose that would reasonably assure the

20   safety of the community.

21           As to Mr. Kelley, the testimony that he was involved

22   in at least eight robberies, all of these robberies are alleged

23   to have involved the use of a weapon, threatening a victim,

24   pointing a weapon at the victim, and then there's the incident

25   involving the sexual assault.  To me, that is evidence that is

1  clear and convincing that there are no conditions that I can

2  impose that would reasonably address the safety of the

3  community.

4        With respect to Mr. Johnson, again involved in,

5  according to the testimony, five robberies, and acted as the

6  person who was driving the car while someone was being sexually

7  assaulted in the car.  And I heard testimony about what was

8  said to the victim of the sexual assault, and Mr. Johnson was

9  in the car, present, and, you know, he's charged with aiding

10  and abetting in all of these counts.

11        I -- the testimony with respect to Mr. Johnson is

12  clear and convincing that when you're willing to participate in

13  something like that, I don't believe that there are conditions

14  that I can set that are going to prevent or reasonably address

15  the danger to the community.

16        And with respect to Mr. Jackson, there's testimony

17  that he is involved in five of these robberies.  There is

18  additional evidence, video evidence, tying him to the

19  robberies, which is an argument that's not available

20  necessarily to all of the other defendants.  He's -- all of the

21  defendants are unemployed.

22        All of the defendants except Mr. Johnson are asking

23  to go back to places that they have previously resided while

24  these offenses were being committed.  And Mr. Jackson was

25  involved in the situation where clearly the victim managed to

1    escape by going in, locking herself in a restroom, and I

2    believe -- I can't recall if it was Mr. Kelley that the video

3    showed having the weapon, but clearly Mr. Jackson is in the

4    car.  There is a weapon present.  There are threats to victims.

5    Victims are forced to ride around.  Victims are forced to give

6    information about their debit cards.  They're -- make transfers

7    on their phones into -- putting money into other accounts that

8    these defendants are alleged to have been -- had available to

9    them.

10           I mean, again, five different times, five occasions,

11   threatening witnesses.  I believe that this is all clear and

12   convincing evidence that there aren't conditions that can

13   reasonably address the safety of the community.  It's largely

14   based on the testimony describing the events.  It is unusual to

15   have defendants without prior criminal histories other than

16   charges on related state charges, but the conduct is extreme.

17   The conduct is dangerous.  The conduct involves multiple

18   threats to multiple people on multiple occasions, involves

19   weapons -- loaded weapons.  And I find, based on the testimony

20   that I've heard today, that there aren't any conditions that I

21   can set that can reasonably assure the safety of community, so

22   I am having the defendants remanded to the custody of the

23   U.S. Marshals.  Is there anything else that we need to address?

24           MS. COLLINS:  No, Your Honor.

25           MR. THOMAS:  No, Your Honor.

1          MS. PASTORINI:  No, Your Honor.

2          MS. SHIELDS:  No, Your Honor.

3          MR. GALLAGHER:  No, Judge.

4          THE COURT:  All right.  Thank you.  You're all

5    excused.

6       (Proceedings concluded at 11:55 a.m.)

7                              *  *  *  *  *

8

9

10

11

12

13

14

15              **C E R T I F I C A T I O N**

16

17          I, Ilene Watson, court-approved transcriber, hereby

18    certify that the foregoing is a correct transcript from the

19    official electronic sound recording of the proceedings in the

20    above-entitled matter.

21

22

23    _____

24    ILENE WATSON, AAERT NO. 447    DATE:  September 24, 2024

25    ACCESS TRANSCRIPTS, LLC